**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF GEORGIA**
**MACON DIVISION**

| | | |
|---|---|---|
| **JAMES COUCH,** | ) | |
| **Plaintiff,** | ) | |
| **v.** | ) | **CIVIL ACTION NO. 5:17-cv-433 (MTT)** |
| **CONVENIENCE STORE INC., *et al.*,** | ) | |
| **Defendants.** | ) | |

## ORDER

Plaintiff James Couch and Defendant Convenience Store Inc., which operates a Piggly Wiggly grocery store, have filed cross-motions for summary judgment.[1] For the following reasons, the Plaintiff's motion (Doc. 25) is **GRANTED in part** and **DENIED in part**, and the Defendant's motion (Doc. 13) is **DENIED**.

## I. BACKGROUND

Plaintiff James Couch brought this suit alleging breach of contract and violations of the Fair Labor Standards Act (FLSA) based on the Defendant's failure to pay appropriate wages to the Plaintiff. The Plaintiff alleges three categories of FLSA violations: (1) failure to pay overtime for the Plaintiff's off-the-clock work for Jim Morrison, a store manager; (2) failure to pay wages when waiting on delivery trucks to arrive; and (3) failure to pay wages for June 21, 2018. Doc. 25-1 at 5-8. The Plaintiff

[1] The Defendant purports to move for summary judgment "on all claims" (Doc. 13-3 at 1), but it only addresses FLSA claims for uncompensated overtime arising from the Plaintiff's work for Jim Morrison. *See generally* Doc. 13-3. To the extent the Defendant moves for summary judgment on claims its motion does not address, the Defendant's motion for summary judgment on those unaddressed claims is **DENIED**.

has moved for summary judgment on the FLSA claims (Doc. 25), and the Defendant has moved for summary judgment on the FLSA claims stemming from the Plaintiff's arrangement with Morrison (Doc. 13).[2]

## II. DISCUSSION

### A. Summary Judgment Standard

A court must grant summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  "A factual dispute is genuine only if 'a reasonable jury could return a verdict for the nonmoving party.'" *Info. Sys. & Networks Corp. v. City of Atlanta*, 281 F.3d 1220, 1224 (11th Cir. 2002) (quoting *United States v. Four Parcels of Real Prop.*, 941 F.2d 1428, 1437 (11th Cir. 1991)).  The burden rests with the moving party to prove that no genuine issue of material fact exists.  *Id.*  The party may support its assertion that a fact is undisputed by "citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials."  Fed. R. Civ. P. 56(c)(1)(A).

"If the moving party bears the burden of proof at trial, the moving party must establish all essential elements of the claim or defense in order to obtain summary judgment."  *Anthony v. Anthony*, 642 F. Supp. 2d 1366, 1371 (S.D. Fla. 2009) (citing *Four Parcels of Real Prop.*, 941 F.2d at 1438).  The moving party must carry its burden by presenting "credible evidence" affirmatively showing that, "on all the essential elements of its case on which it bears the burden of proof at trial, no reasonable jury

---

[2] The Defendant's motion also addressed claims against William Jones, the Defendant's CEO and CFO (Doc. 13-3 ay 4), but the parties have since stipulated to Jones's dismissal.  Doc. 31.

could find for the nonmoving party." *Four Parcels of Real Prop.*, 941 F.2d at 1438. In other words, the moving party's evidence must be so credible that, if not controverted at trial, the party would be entitled to a directed verdict. *Id*.

"If the moving party makes such an affirmative showing, it is entitled to summary judgment unless the nonmoving party, in response, 'come[s] forward with significant, probative evidence demonstrating the existence of a triable issue of fact.'" *Id.* (quoting *Chanel, Inc. v. Italian Activewear of Fla., Inc.*, 931 F.2d 1472, 1477 (11th Cir. 1991)) (alteration in original). However, "credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge. ... The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). Thus, the Court "'can only grant summary judgment if everything in the record demonstrates that no genuine issue of material fact exists.'" *Strickland v. Norfolk S. Ry. Co.*, 692 F.3d 1151, 1154 (11th Cir. 2012) (quoting *Tippens v. Celotex Corp.*, 805 F.2d 940, 952 (11th Cir. 1986)).

In contrast, "[w]hen the *nonmoving* party has the burden of proof at trial, the moving party is not required to 'support its motion with affidavits or other similar material *negating* the opponent's claim.'" *Four Parcels of Real Prop.*, 941 F.2d at 1437 (quoting *Celotex Corp. v. Cartrett*, 477 U.S. 317, 323 (1986)). The moving party "simply may show . . . that there is an absence of evidence to support the nonmoving party's case." *Id.* at 1438 (internal quotation marks and citation omitted). "Assuming the moving party has met its burden, the non-movant must then show a genuine dispute regarding any

issue for which it will bear the burden of proof at trial." *Info. Sys. & Networks Corp.*, 281 F.3d at 1224-25 (citing *Celotex Corp.*, 477 U.S. at 324).

The standard of review for cross-motions for summary judgment does not differ from the standard applied when only one party files a motion. *See Am. Bankers Ins. Grp. v. United States*, 408 F.3d 1328, 1331 (11th Cir. 2005). "Cross-motions for summary judgment will not, in themselves, warrant the court in granting summary judgment unless one of the parties is entitled to judgment as a matter of law on facts that are not genuinely disputed." *United States v. Oakley*, 744 F.2d 1553, 1555 (11th Cir. 1984) (quotation marks and citation omitted). The Court will consider each motion on its own merits, resolving all reasonable inferences against the party whose motion is under consideration. *See Am. Bankers Ins. Grp.*, 408 F.3d at 1331.

**B. Analysis**

Under FLSA, "[n]o employer shall employ any of his employees who in any workweek is engaged in commerce or in the production of goods for commerce . . . for a workweek longer than forty hours . . . unless such employee receives compensation for his employment in excess of the hours above specified at a rate not less than one and one-half times the regular rate at which he is employed." 29 U.S.C. § 207(a)(2)(C). "An unpaid-overtime claim has two elements: (1) an employee worked unpaid overtime, and (2) the employer knew or should have known of the overtime work." *Bailey v. TitleMax of Ga., Inc.*, 776 F.3d 797, 801 (11th Cir. 2015) (citation omitted).

**1. Failure to Pay Overtime for Off-the-Clock Work for Jim Morrison**

One of the Plaintiff's claims concerns work he performed for Jim Morrison, a managerial employee at Piggly Wiggly. It is undisputed that the Plaintiff worked off the

clock on certain occasions and was not paid by the *Defendant* at the required rate of 1.5 times the employee's normal wage for doing so. Doc. 33-1 ¶ 5.

The Plaintiff performed this off-the-clock work for Morrison pursuant to a running financial relationship between the two, a relationship that was entered into for the Plaintiff's personal benefit. Doc. 28 at 48:13-50:24. Morrison had loaned money to the Plaintiff to prevent his truck from being repossessed. *Id*. According to the Plaintiff, Morrison loaned him $300 for a monthly payment on his truck and, later, loaned him approximately $2,100 to get his truck out of title pawn. *Id*. at 56:1-57:4. According to Morrison, the relationship started with an approximately $1,200 loan for the Plaintiff to get his truck out of title pawn. Doc. 17 at 21:16-22:21. Morrison testified that he borrowed money at the bank to make the loan and that he did not charge the Plaintiff interest. *Id*. at 23:5-24:23. Morrison also made other loans to the Plaintiff—one for a Georgia Power bill and, according to Morrison, one for rent to prevent the Plaintiff from being evicted. Docs. 28 at 62:25-63:22; 17 at 33:9-24, 25:8-22. In sum, while the details of the loans are muddled, it is undisputed that Morrison, individually, made personal loans to the Plaintiff.

The Plaintiff made agreed-upon repayments—$100 a month, according to Morrison (Doc. 17 at 24:7-16), and $100 or $50 bimonthly or every two weeks, according to the Plaintiff (Doc. 28 at 59:1-25)—for a time, then could not make them anymore. According to Morrison, the Plaintiff had a stroke and was out of work for a while, during which time the payments ceased. Doc. 17 at 25:23-26:14. Morrison testified that when the Plaintiff recovered, he asked Morrison if he could earn credit on the loan by working. *Id*. at 27:11-28:10. Those jobs began with personal work for

Morrison, like moving furniture, but eventually the Plaintiff began working extra hours at Piggly Wiggly in return for loan credits from Morrison. *Id*. at 27:15-30:8. According to the Plaintiff, his off-the-clock duties were the same as his on-the-clock duties, plus stripping and waxing floors, although Morrison claims the Plaintiff's off-the-clock time was spent on less important tasks. Docs. 28 at 76:7-24; 17 at 46:25-47:8. Morrison testified that he would compensate the Plaintiff in cash when the Plaintiff needed it, but the Plaintiff asserted he was never paid in cash. Docs. 17 at 30:12-31:12; 28 at 73:10-74:7. Morrison testified all money came from him. Doc. 17 at 34:4-5. Morrison also testified the loan was eventually paid in full. *Id*. at 34:24-35:17, 66:7-12. Morrison testified that because he did not charge interest and he gave gas money to the Plaintiff's mother, he lost money even after repayment. *Id*. at 36:8-12.

The amount of off-the-clock work by the Plaintiff is disputed. Morrison testified the Plaintiff worked less than twenty hours per week for him and did not work for him every week. Doc. 33-2 ¶¶ 34-35. The Plaintiff testified he worked off the clock for four to six hours a day, four days a week, for a year and eight months. Doc. 28 at 89:7-90:13, 90:21-91:10, 94:16-21, 96:14-19. Elsewhere in his deposition, the Plaintiff claimed he worked off the clock for Morrison four to five days a week. *Id*. at 54:11-16. The Plaintiff also testified that everybody who worked at the store could corroborate that claim and that Frank Hellvig, a manager, knew about his off-the-clock work. *Id*. at 91:6-25, 95:14-96:18. But Hellvig testified he never knew of anyone working off the clock (Doc. 24 at 37:12-20), and the other employees who were deposed did not corroborate the Plaintiff's claim that he worked off the clock for four to six hours a day, four days a week, for a year and eight months. Docs. 35 at 25:14-23; 36 at 14:21-15:16. The

Plaintiff testified that payment receipts record "[p]robably about 90%" of his off-the-clock work, and those receipts come to approximately $3,000. Docs. 28 at 79:2-23; 28-12 at 1-8.[3]

There is also conflicting evidence on the rate of compensation for the off-the-clock work. The Plaintiff claims he always made exactly $10 an hour for his off-the-clock work for Morrison. Doc. 28 at 52:7-53:12. But he also testified that Morrison might ask him to do a four-hour job for $50—implying an hourly rate of $12.50. *Id*. at 69:16-25. And he testified he once did three hours of work for loan credit in the amount of $50—implying a rate of $16.67 for that job. *Id*. at 73:10-23. Morrison, on the other hand, testified the rate "worked out to approximately $25.00 per hour of work," and he also referred to payments of $25 for 20 minutes of work on one occasion and of $100 for certain jobs around the store. Docs. 33-2 ¶ 33; 17 at 27:15-23, 30:9-19. Another employee who had a loan arrangement with Morrison testified he was paid approximately $25.00 per hour. Doc. 22 at 40:2-11.

The Plaintiff's claim of four to six hours of work for Morrison a day, four days a week, for a year and eight months, at $10 per hour, indicates total payments in the approximate range of $12,000 to $19,000.[4] Those figures are obviously inconsistent

[3] The Plaintiff also testified that "at least four times a week"—that is, on every occasion he worked—there was no receipt to memorialize the work. Doc. 28 at 52:25-53:3; *see id*. at 91:6-10, 96:14-19. That testimony is potentially inconsistent with the testimony that the receipts account for 90% of the off-the-clock work.

[4] These calculations are rough and intended only to illustrate the extent of certain disparities in the evidence. The first number calculates a minimum at four hours a day for eighteen months, or twenty months at the store minus approximately two months to account for a medical absence (Doc. 28 at 55:2-5), and the second calculates a maximum at six hours a day for twenty months. The point is not to provide precise numbers, but to demonstrate that the Plaintiff's claims lead to a wide range of numbers, all vastly disproportionate to the approximate value of $3,000 indicated by the receipts.

with the claim that receipts totaling $3,000 account for about 90% of the work done by the Plaintiff for Morrison.

*a. The Plaintiff's Motion for Summary Judgment*

The Defendant admits it is covered by FLSA and the Plaintiff is not an exempt employee. Doc. 33-1 ¶¶ 19, 21. However, the Defendant claims that the Plaintiff cannot establish as a matter of law that he worked unpaid overtime, because *Morrison* paid him. Doc. 33 at 2. Viewing the evidence in the light most favorable to the Defendant, the non-moving party for purposes of this motion, the Plaintiff was compensated at a rate of approximately $25.00 per hour, substantially more than one and a half times his hourly rate, which ranged between $7.25 and $8.50 per hour. Doc. 33-2 ¶ 33; s*ee generally* Doc. 23-6 at 1-36. The Defendant argues this creates a fact issue as to whether the Plaintiff worked unpaid overtime. Doc. 33 at 5.

In reply, the Plaintiff makes two arguments. The first is that Eleventh Circuit authority requires the *employer*, not some third party, to provide compensation for overtime hours. Doc. 39 at 3 (citing *Wagner v. Lee Cty*., 678 F. App'x 913, 925 (11th Cir. 2017); *Morgan v. Family Dollar Stores*, 551 F.3d 1233, 1265 (11th Cir. 2008); *Bailey*, 776 F.3d at 800). None of those cases reached the issue of whether an employer violates FLSA when a manager pays one and a half times the regular rate out of his own pocket, and certainly none addresses anything remotely similar to the facts of this case—a personal arrangement between two employees.

With regard to the argument that Morrison's payments do not discharge the Defendant's FLSA obligations, the Plaintiff has failed to establish as a matter of law that Morrison was not acting as an agent of the employer when he paid the Plaintiff. *See*

Doc. 39 at 3. Indeed, the Plaintiff, elsewhere, argues that the Defendant had "actual and constructive" knowledge of the Plaintiff's off-the-clock work for Morrison because Morrison knew about the work, an argument which assumes Morrison was an agent of the Defendant. Doc. 25-1 at 14.[5] But if Morrison's knowledge of the Plaintiff's off-the-clock work is attributable to the Defendant—whether through agency or as a joint employer,[6] the Plaintiff does not specify—the Plaintiff provides no reason why Morrison's payments to the Plaintiff are not also attributable to the Defendant.

Next the Plaintiff argues that FLSA requires cash payments, not loan credits. Doc. 39 at 3-4 (citing *Arriaga v. Fla. Pac. Farms, L.L.C.*, 305 F.3d 1228, 1235 (11th Cir. 2002)). The Plaintiff argues that "Morrison compensated Plaintiff with credits off a loan"

[5] The Plaintiff also argues he can show knowledge through Hellvig. Doc. 25-1 at 14. Perhaps he can, but not as a matter of law: Hellvig testified he did not know of any off-the-clock work by the Plaintiff. Doc. 24 at 37:12-20. The Plaintiff also claims generally that "Cleveland also admits knowledge," but the evidence for that is limited to knowledge of employees waiting for the trucks; the Plaintiff does not point to evidence Cleveland knew of the off-the-clock work for Morrison. Doc. 39 at 7 (citing Doc. 21 at 14:4-15:15).

[6] FLSA defines "employer" to include "any person acting directly or indirectly in the interest of an employer in relation to an employee." 29 U.S.C. § 203(d). That definition applies to Morrison in relation to the Plaintiff. Further, because Morrison was "acting . . . in the interest of the other employer," the Defendant, when he instructed the Plaintiff to perform work at the store, he may be considered a joint employer under FLSA. *See* 29 C.F.R. § 791.2(b). If he is, his payment of the Plaintiff's due wages would relieve the Defendant of its FLSA obligation to the Plaintiff. *See* 29 C.F.R. § 791.2(a) ("In discharging the joint obligation each employer may, of course, take credit toward minimum wage and overtime requirements for all payments made to the employee by the other joint employer or employers."). To rule otherwise would create a clear risk of a windfall to the Plaintiff, as the Defendant points out. *See* Doc. 33 at 2.

The Court notes that the issue of joint employment usually arises in a different posture: when the Plaintiff has worked uncompensated overtime for one defendant and wishes to extend liability to a second defendant, who is usually an individual manager (*see, e.g.*, *Gonzalez v. Old Lisbon Rest. & Bar L.L.C.*, 820 F. Supp. 2d 1365, 1369 (S.D. Fla. 2011)), a lessor or lessee of employees or their services (*see, e.g.*, *Layton v. DHL Exp. (USA), Inc.*, 686 F.3d 1172, 1175 (11th Cir. 2012); *Tullous v. Texas Aquaculture Processing Co. LLC*, 579 F. Supp. 2d 811, 814 (S.D. Tex. 2008); *Quinteros v. Sparkle Cleaning, Inc*., 532 F. Supp. 2d 762 (D. Md. 2008)), or a parent company of a subsidiary employer (*see, e.g.*, *In re Enter. Rent-A-Car Wage & Hour Employment Practices Litig.*, 683 F.3d 462, 464 (3d Cir. 2012)). In those cases, the most common test for joint employment focuses on control and economic dependence.

Here, by contrast, the individual manager (Morrison) hired the Plaintiff for a separate, discrete employment, and it is undisputed Morrison could control the terms of the overtime work arrangement. The relevant inquiry here, per the labor regulations, is whether the Plaintiff's employment for Morrison was sufficiently related to his employment for Convenience Store, Inc. to be considered joint employment.

and "[t]hese credits are not cash or facilities under the FLSA," so the Plaintiff worked uncompensated overtime. Doc. 39 at 4.

There are two problems with that argument. First, Morrison testified he compensated the Plaintiff with both cash and loan credits. Doc. 17 at 27:15-30:8; 30:12-31:12. There is evidence the Plaintiff worked as much as 1500 hours for Morrison (Doc. 28 at 91:6-10, 96:14-19), in which case the roughly $3,050 of compensation in loan credits (*see id*. at 51:8-23) would potentially have been dwarfed by the cash payments. In short, the Plaintiff's claim that Morrison paid the Plaintiff in loan credits ignores evidence which clearly indicates he also paid cash.

Second, the Plaintiff provides no legal support for such a narrow interpretation of the term "cash." The Plaintiff misreads *Arriaga v. Fla. Pac. Farms, L.L.C.* to interpret FLSA as strictly requiring payment in either cash or in facilities. But *Arriaga* addressed a different issue altogether: federal regulations requiring that FLSA wages be "free and clear" of kickbacks, meaning that an employer could not, for instance, pay minimum wage but require the employee to pay for necessary work equipment. 29 C.F.R. § 531.35 ("Whether in cash or in facilities, 'wages' cannot be considered to have been paid by the employer and received by the employee unless they are paid finally and unconditionally or 'free and clear.'"). In *Arriaga*, farmworker plaintiffs had been paid above minimum wage but were required to pay certain costs of their employment which could be viewed as "de facto [wage] deductions" for FLSA purposes. 305 F.3d at 1237. Regarding FLSA's minimum wage law as it applies to de facto deductions, the Eleventh Circuit stated:

> Employers must provide workers' weekly wages "in cash or in facilities" [quoting 29 C.F.R. § 531.35], "free and clear" of improper deductions, at a

> rate no lower than the minimum wage rate ($5.15 per hour since 1997). 29 U.S.C. § 206(a)(1); 29 C.F.R. §§ 531.35, 776.4. The only statutory exception to this requirement is set forth in 29 U.S.C. § 203(m), which allows an employer to count as wages the reasonable cost "of furnishing [an] employee with board, lodging, or other facilities, if such board, lodging, or other facilities are customarily furnished by such employer to his employees."

*Id*. From this, the Plaintiff draws the conclusion that the Eleventh Circuit requires cash or facilities as the *exclusive* means of compensating an employee for FLSA purposes. The Plaintiff argues that because there is "only [one] statutory exception" to this requirement, the requirement should be construed strictly. Doc. 39 at 4 (quoting *Arriaga*, 305 F.3d at 1235).

This is a clear misreading of *Arriaga*. The regulations cited require that payment be free and clear of kickbacks; they do not require that payment be made only in cash or in facilities. *See* 29 C.F.R. § 531.35. Similarly, the "exception" in *Arriaga* clearly refers to the "free and clear" requirement, 29 C.F.R. § 531.35, not to the Plaintiff's supposed "in cash or in facilities" requirement.[7] There is, of course, no attempt by the Defendant or Morrison to impose wage deductions, such as charges for tools or lodging, here. The Plaintiff's argument that precedent requires FLSA payments to be in cash or in facilities, therefore, finds its only support in a misreading of *Arriaga*, which dealt with wage deductions, not the issue in this case.

Second, the Plaintiff's conclusory argument that loan "credits are not cash or facilities under the FLSA," is just that—an unsupported conclusion. Doc. 39 at 4. The

---

[7] This reading of the "exception" is supported not only by context, but also logic: allowing employers to count the cost of "board, *lodging*, or *other facilities*" is clearly not an exception to a requirement that the Plaintiff can only be paid in cash or *in facilities*. *Arriaga*, 305 F.3d at 1235 (emphasis added). "[T]his requirement," the only one the quoted language in *Arriaga* recognizes, is the requirement that payment be free and clear. *Id*. Under the Plaintiff's reading, the Eleventh Circuit's gloss of 29 C.F.R. § 531.35 imposes additional requirements not in the regulations or the statute.

Plaintiff fails to define cash or facilities, or to provide any authority giving a definition.[8] FLSA does allow employers to meet wage obligations by providing meals, electricity, water, gas, clothing, and company merchandise—clearly inconsistent with the Plaintiff's apparently narrow understanding of "cash or facilities." *Arriaga*, 305 F.3d at 1236.

Because the Plaintiff has failed to show he was not compensated in accordance with FLSA on the unpaid overtime work for Morrison, the Plaintiff's motion for summary judgment (Doc. 25) is **DENIED** as to the hours worked for Morrison.

*b. The Defendant's Motion for Summary Judgment*

The Defendant also moves for summary judgment, claiming it did not "suffer or permit" the Plaintiff to do off-the-clock work for Morrison. Doc. 13-3 at 10; *see* 29 U.S.C. § 203(g).

As noted, there are two elements to a FLSA case: "(1) an employee worked unpaid overtime, and (2) the employer knew or should have known of the overtime work." *Bailey*, 776 F.3d at 801. Viewing the facts in the light most favorable to the Plaintiff, the nonmoving party, the Plaintiff worked off the clock for Morrison as much as 24 hours a week, for a year and eight months, during which time he was paid only $10 per hour by Morrison. Doc. 28 at 52:7-53:12, 91:6-10, 96:14-19. There is, therefore, some evidence the Plaintiff was not adequately compensated for overtime work.

With regard to the Defendant's knowledge, it is undisputed, of course, that Morrison knew about the off-the-clock work. Viewing the facts in the light most favorable to the Plaintiff, every store employee, including manager Frank Hellvig, knew

[8] Additionally, viewing the evidence in the light most favorable to the Defendant, Morrison had already given the Plaintiff cash, in advance; the work done later was to discharge the debt on that cash, and it was compensated at approximately three times the Plaintiff's normal wages. *See* Doc. 33-2 ¶ 33.

about the extra work. *Id*. at 44:9-45:4, 91:6-25, 95:14-96:18. That is sufficient to create a fact issue as to whether the Defendant knew or should have known of the off-the-clock hours.

The Defendant claims that it did not "suffer or permit" the Plaintiff to do off-the-clock work for Morrison, and thus did not employ him during those overtime hours under FLSA. Doc. 13-3 at 10; *see* 29 U.S.C. §§ 203(g), § 207(a)(2)(C). In effect, the Defendant argues that the arrangement between Morrison and the Plaintiff was entirely personal to them and that the Plaintiff was not expecting to be paid by the Defendant as he worked off Morrison's loan. Although unable to "locate any cases that have facts substantially similar" to the facts of this case, the Defendant argues that an employer does not "suffer or permit" work unless the employee expects compensation from the employer. *Id*. at 10, 13. The Defendant supports this argument with general statements of FLSA's policy.[9] For example, the Supreme Court has stated that "a person whose work serves only his own interest" is not an employee for purposes of FLSA liability, and the Eleventh Circuit has stated that "'[T]he purpose of the Fair Labor Standards Act [was not] to create new wage liabilities, but where a wage liability exists, to measure it by the standards fixed by law.'" Doc. 13-3 at 11 (quoting *Walling v. Portland Terminal*

[9] The Defendant cites two cases which do not support the argument it makes. First, in *Patel v. Wargo*, 803 F.2d 632 (11th Cir. 1986), the court found a district court had not committed clear error in determining that the company leasing a building to a business was not an employer of the plaintiff. But in that case, the plaintiff "did only a minimal amount of work" for the lessor, and he did that work "as a volunteer." *Id*. at 635. The court did uphold, on clear-error review, the district court's determination the lessor was not a joint employer, but that was because the lessor did not employ the plaintiff at all. Here, by contrast, both the Defendant and Morrison were clearly employers of the Plaintiff.

The citation to *Marleau v. Lawmen's & Shooters' Supply, Inc.*, 2009 WL 10668544, at *4 (S.D. Fla. May 15, 2009), does not apply to these facts, either. As the district court noted, "[t]he key dispositive fact [in that case was] the memorialization of the Plaintiff's agreement not to seek compensation," and the uncompensated work "bore no direct relationship to his regular job duties." *Id*. at *5. Here, of course, there is evidence the Plaintiff's off-the-clock work bore at least *some* relationship to his regular job duties, and there was no memorialization of an agreement not to seek compensation.

*Co.*, 330 U.S. 148, 152 (1947); *Patel v. Wargo*, 803 F.2d 632, 635 (11th Cir. 1986) (alterations in original) (quotation marks omitted)). But a jury could find that the Plaintiff was working for the Defendant's interest or for both his own interest and that of the Defendant. For example, because Morrison was the Defendant's agent, a jury could find that when he scheduled the Plaintiff to work at the Defendant's store, that work, at least in part, served the Defendant's interest. A jury could also find that the Defendant was a joint employer with Morrison because Morrison was "acting . . . in the interest of the other employer," the Defendant, when he instructed the Plaintiff to perform work at the store. *See* 29 C.F.R. § 791.2(b). On the other hand, the jury could find this was a purely personal arrangement between Morrison and the Plaintiff, a relationship for which the Defendant is not responsible. In short, the Defendant is not entitled to judgment as a matter of law. The Defendant's motion for summary judgment is therefore **DENIED**.

**2. Failure to Pay Wages when Waiting on Delivery Trucks**

The Plaintiff also claims the Defendant instructed employees to arrive at 4:00 a.m. to unload delivery trucks, but did not allow them to clock in until the truck arrived, which was often after 4:00 a.m. *See* Doc. 25-1 at 7.

The Plaintiff argues he is entitled to summary judgment, pointing, in addition to his testimony, to deposition testimony by Cleveland, a manager, that some employees were instructed to arrive at the store at 4:00 a.m. but, on certain occasions, could not clock in until later.[10] Docs. 28 at 101:3-102:3; 21 at 13:13-15:15. That happened for

[10] The Plaintiff's attorneys also claim, in the Plaintiff's statement of material facts, that when a truck was late, the Plaintiff would "begin setting up the store for the truck's arrival, setting up the freezer section for the day, and forming plans to complete the day's work—all off the clock." Doc. 25-2 ¶ 51 (citing Doc. 25-11 at 21:8-22:4). However, that misrepresents the cited testimony. In the cited testimony, Allen Duncan stated they would sometimes talk about the day's work while waiting for the truck. Doc. 25-11 at 21:8-22:4. He did not say they began setting up the store.

approximately two months, according to Cleveland, after he started working at the store. Doc. 21 at 6:2-4, 15:1-6. Cleveland admitted that the Plaintiff and others could not clock in until the truck arrived. *Id*. at 15:7-15.

The Defendant fails to produce evidence refuting the Plaintiff's claim. One coworker testified that to the best of his recollection, he and the Plaintiff clocked in when they arrived at the store, regardless of whether the truck was late or not. Doc. 36 at 24:18-25:14. But he does not say he was present every time the Plaintiff worked. Another coworker testified that employees were sometimes given the option to clock in and begin work instead of waiting and talking outside. Doc. 22 at 19:17- 22:4. But he also testified that they were not always given this option, and he claims the Plaintiff was with him on occasions when they were not given that option.[11] *Id*. at 20:5-17. In short, the Plaintiff has produced evidence he was made to wait at the store without clocking in, and the Defendant has not produced any evidence refuting that claim.

Waiting time is compensable under FLSA. *See Skidmore v. Swift & Co.*, 323 U.S. 134, 137 (1944) (noting time during which an employee is "engaged to wait" is compensable); 29 C.F.R. § 785.15 (collecting examples of compensable work time); 29 C.F.R. § 785.16 (citing truck drivers waiting at the job site for goods to be loaded as an example of compensable work time). Because the Plaintiff was not free to use that time effectively for his own purposes, he was working. *See* 29 C.F.R. § 785.16. The Defendant is liable for that time.

[11] Duncan also received a $65 check in backpay, which he believes was "something to do with like the truck. I think there was a couple of times we didn't clock in." Doc. 22 at 16:20-19:3.

Although the Plaintiff has established he performed uncompensated work, he has not quantified that work. There are time sheets in the record,[12] but the parties do not address them in the context of this claim. The Plaintiff's motion for summary judgment (Doc. 25) is therefore **GRANTED** on liability only as to the time spent waiting for delivery trucks. A jury will determine what the Defendant owes the Plaintiff for that work.

**3. Failure to Pay the Plaintiff's Wages for June 21, 2016**

In his brief, the Plaintiff also argues that he was not paid for six hours of work on June 21, 2016. Doc. 25-1 at 8. The Plaintiff apparently punched in at 7:57 a.m. but failed to punch out, and thus got credit for zero hours on that shift. *See* Doc. 37-12 at 4. The Plaintiff cites only his work schedule, which has him scheduled until 2:00 p.m., as evidence he actually worked until 2:00 p.m. Doc. 25-2 ¶ 60 (citing Doc. 25-10 at 11).

But the Plaintiff does not testify that he actually worked during that time, nor does he produce any other evidence that he worked during that time. That he was scheduled for those hours does not establish he actually worked them. *See* Doc. 25-2 ¶¶ 56-60. It is possible he worked until his scheduled time; it is also possible he went home for lunch, left for a doctor's appointment, or left at 7:57 a.m. Or he may have swapped shifts with someone else. The schedule is not enough evidence to show he actually worked from 7:57 a.m. to 2:00 p.m.

[12] The timesheets are potential evidence of the extent of the uncompensated work performed by the Plaintiff. Delivery trucks came on Mondays and Thursdays. Doc. 15 at 83:23-84:22. On Mondays and Thursdays, the Plaintiff usually clocked in within five minutes of 4:00 a.m. Doc. 37-12 at 1-9. Of the times when the Plaintiff did not clock in until later, most of them were from May 2017 to August 2017, around the time that Cleveland, according to his deposition testimony, started telling employees to arrive by 5:00 a.m., not 4:00 a.m. *See* Doc. 21 at 6:2-4; 14:8-15:16. But it is unclear exactly when Cleveland changed the policy, and it is unclear, for each occasion the Plaintiff clocked in significantly after 4:00 a.m., whether that represents uncompensated waiting time or simply a later arrival to work.

The Plaintiff argues that it is the Defendant's responsibility to keep accurate records, not the Plaintiff's. Doc. 25-1 at 12 (citing *Malphurs v. Cooling Tower Sys.*, 2016 U.S. Dist. LEXIS 27631, at *23 (M.D. Ga. Mar. 4, 2016)). That may be true, but the initial burden is the Plaintiff's:

> [A]n employee has carried out his burden if he proves that he has in fact performed work for which he was improperly compensated and if he produces sufficient evidence to show the amount and extent of that work as a matter of just and reasonable inference.

*Malphurs*, 2016 U.S. Dist. LEXIS 27631, at *23 (quoting *Allen v. Bd. of Pub. Educ. for Bibb Cty.*, 495 F.3d 1306, 1316 (11th Cir. 2007)). The Plaintiff does not point to any evidence he worked the time he was scheduled for. He has not, therefore, shown he is entitled to summary judgment on this claim.

## III. CONCLUSION

For the reason's stated, the Plaintiff's motion for summary judgment (Doc. 25) is **GRANTED in part** and **DENIED in part**. It is **GRANTED** as to liability for the Plaintiff's uncompensated time spent waiting for trucks, although the issue of damages remains for trial, and it is **DENIED** as to all other claims. The Defendant's motion for summary judgment (Doc. 13) is **DENIED**.

**SO ORDERED**, this 5th day of February, 2019.

S/ Marc T. Treadwell
MARC T. TREADWELL, JUDGE
UNITED STATES DISTRICT COURT